**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LL B SHEET 1, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL J. LOSKUTOFF,<br><br>　　　　　　Defendant. | Case No. 16-cv-02349-BLF<br><br>**ORDER GRANTING IN PART AND DEFERRING RULING ON IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF 92] |

　　　　This case involves a deal between Plaintiff LL B Sheet 1, LLC and Defendant Michael J. Loskutoff, in which Defendant sold Plaintiff the rights to a lease of a cell phone tower. At the time of the deal, Plaintiff says it believed that the lease had two streams of rental income. In fact, at the time of the purchase, the lease had only one stream of rental income. Plaintiff alleges that Defendant knew that the second stream of rental income had been terminated and fraudulently misrepresented and concealed this information from Plaintiff in order to close the deal. In his answer, Defendant asserted fourteen affirmative defenses and a counterclaim for rescission of the agreement.

　　　　Before the Court is Plaintiff's motion for summary judgment of Defendant's affirmative defenses and his counterclaim. ECF 92. The Court heard oral argument on January 7, 2019. For the reasons that follow, the Court DEFERS RULING ON Plaintiff's motion for summary judgment as to Defendant's fourth affirmative defense and GRANTS the motion as to the remainder of Defendant's affirmative defenses and his counterclaim for rescission.

**I.　BACKGROUND**

　　**A.　Undisputed Facts**

　　　　Defendant Michael Loskutoff is the sole trustee of the Michael John Loskutoff Trust dated

November 20, 1992 (the "Trust"). Saba Decl. ISO Mot., Ex. C, ECF 92-4. The Trust owns a parcel of land at 1391 Geneva Dr. in Sunnyvale, California ("the Property"). *Id.*, Ex. B at 19:1–13, ECF 92-3. On July 1, 1996, Defendant leased a portion of the land to Spring Spectrum, L.P. ("Sprint") for Sprint to construct a cell phone tower on the Property, which remains on the Property today. *Id.*, Ex. D, ECF 92-5; *id.*, Ex. B at 19:1–13, ECF 92-3. The tower is approximately 100 feet tall, located on the back of the property, and enclosed by a locked fence to which Defendant does not have a key. *Id.*, Ex. B at 22:10–23:9.

Several changes were made that affected the rents paid under the lease over the next fifteen years. In September 2002, Defendant and Sprint amended the lease to allow Sprint to enter into a sublease (or co-location agreement) with AT&T Wireless ("AT&T"), which would allow AT&T to use the cell tower, and to increase Sprint's rents by $2,000 monthly. Saba Decl. Ex. F, ECF 92-7. Under the terms of the amended lease, Sprint entered into a sublease with AT&T. The amended lease did not require Sprint to inform Defendant if AT&T terminated its sublease with Sprint, and Defendant never had any interaction with or received any rents directly from AT&T. *Id.*; Loskutoff Decl. ISO Opp. ¶ 4, ECF 93-2. In February 2007, CCGS Holdings, LLC ("Crown Castle") informed Defendant that due to a merger, it would begin managing the cell phone tower for Sprint, though the lease agreement remained unchanged. *Id.*, Ex. G. In March 2011, Sprint paid Defendant $10,000 to again amend the agreement, this time to extend the lease duration, increase the rent, and provide Sprint an option to obtain a $1.2 million easement or to match a purchase offer from any other interested party—*i.e.*, a right of first refusal. *Id.*, Ex. J at 2–4.

By October 2007, Defendant was receiving an annual rent of $48,374.10 for the lease from Sprint, with $21,342.80 attributable to Sprint and $27,031.30 attributable to AT&T. *Id.*, Ex. H, ECF 92-9. On April 1, 2010, Defendant received an annual rent check of $54,742.63 for the lease. *Id.*, Ex. I, ECF 92-10. On April 1, 2011, he received annual rents of $56,942.73. *Id.*, Ex. K, ECF 92-12. On April 1, 2012, he received $59,220.44. *Id.*, Ex. L, ECF 92-13. In April 2013, he received $61,589.26. *Id.*, Ex. M, ECF 92-14. But, in April 2014, he received only $28,260.30, less than half the amount received in 2013. *Id.*, Ex. P, ECF 92-17.

The 2014 rent was significantly lower because on October 25, 2013, AT&T had notified

Crown Castle that it would be terminating its sublease of the tower on December 31, 2013. *Id.*, Exs. N & O, ECF 92-15, 92-16. Sprint, however, did not terminate its lease with Defendant; the lease remains in effect today. Loskutoff Decl. ¶ 11; Ballesteros Decl. ISO Opp. ¶ 3, Ex. 2, ECF 93-1. On April 23, 2014, after receiving this reduced check, Defendant contacted Crown Castle's Landowners Help Desk, which is a resource for landowners to receive help from Crown Castle and allows Crown Castle to log the interaction. *Id.*, Ex. Q at 9:14–10:4, ECF 92-18; *id.*, Ex. R ("Egercic Decl.") at 6:5–8, ECF 92-19. Crown Castle employee Denise Egercic spoke to Defendant and created the following log after the call ended: "Received a call from LL [Landlord] Mike . . . . He was inquiring why his check . . . was so much less than normal. It appears that AT&T terminated and was discovered through a rent recon. It appears that we received notice from AT&T however the LL indicated that he was not notified. Forward to James Laque for assistance." *Id.*, Ex. S, ECF 92-20.

On May 5, 2014, Defendant emailed Crown Castle employee Ryan Hull asking him to "verify who is on the Sprint poll for this site [at 1391 Geneva Drive]. My records show Sprint, Clear Wire and AT&T." *Id.*, Ex. T, ECF 92-21. Mr. Hull responded with "I show Sprint and Clearwire on the tower. I don't show AT&T as being installed on the tower any longer." *Id.* Defendant responded on May 16, 2014 by asking "When did AT&T came [sic] off the tower?" *Id.*

Later in May 2014, Defendant began the process of selling the Sprint lease to Plaintiff. A separate company, Telecom Lease Advisors, LLC ("TLA") performed the due diligence process for Plaintiff.[1] Compl. ¶ 13. Sometime before May 28, 2014, Defendant spoke to John Mondragon, the broker for the eventual lease sale between Plaintiff and Defendant, about the possibility of Plaintiff purchasing the lease. *Id.*, Ex. B at 100:1–102:25. During that conversation, Defendant did not mention that there was an issue receiving the 2014 AT&T rent, and he told Mr. Mondragon that he was receiving money from both Sprint and AT&T. *Id.* at 102:14–25; 103:7–12.

---

[1] Following Plaintiff's lead, *see, e.g.*, Mot. at 7, the Court refers to actions taken by TLA as if they were taken by Plaintiff. Plaintiff is an entity owned by Insite Wireless Group, a partner of TLA. *See* Saba Decl., Ex. V., at 10:18–12:11.

On May 28, 2014, Mr. Mondragon sent Defendant a lease-purchase application to fill out. *Id.*, Ex. X, ECF 92-25; *id.*, Ex. Y at 33:4–35:10, ECF 92-26. Defendant filled out the application. *Id.*, Ex. W, ECF 92-24; *id.*, Ex. B at 90:12–21. The application stated that Crown Castle was the tenant and the other carriers on the site were Sprint, Clearwire & AT&T. *Id.*, Ex. W at 3. It also stated that the lease was in full force and effect. *Id.* In the application, Defendant certified that the information in the application was true and agreed to provide any later-received information that might change any of his answers. *Id.* The application did not indicate that AT&T either actually or potentially was no longer on the lease. In the same email, Mr. Mondragon also sent a proposed term sheet for a sale of the lease for $925,000. *Id.*, Ex. X; *id.*, Ex. Y at 33:4–35:10. The schedule to the term sheet indicated that the Property had two rental income streams of $27,173 and $34,416, respectively. *Id.*, Ex. X. Defendant provided these numbers to Mr. Mondragon in advance of receiving the term sheet.

On June 4, 2014, Plaintiff and Defendant signed the final term sheet, which indicated the two rental streams. *Id.*, Ex. Z, ECF 92-27. When the final term sheet was executed, Defendant did not advise Plaintiff that there might be a potential issue with the AT&T rent. *Id.*, Ex. B at 106:17–20. Crown Castle does not provide third parties with information about the properties they manage; it is the obligation of the landlord to provide any such details. Saba Decl., Ex. Q at 51:6–52:4.

In late July 2014, Defendant emailed his attorney Frank Maiorana about the agreement, saying, in part, "I have an agreement with AT&T but I can not honestly tell you they are on the cell tower or off the cell tower. They do not give me notice as to who is on or off the tower." Loskutoff Decl., Ex. 6. Defendant indicated Plaintiff had told him AT&T was on the tower, but he was unsure whether AT&T would need to notify him if they had terminated, so he sought guidance from Mr. Maiorana on whether he needed indemnification for who was on the site or to have Plaintiff do due diligence to determine AT&T's status. *Id.* Mr. Maiorana responded with "You make no representations or warranties in the agreements about AT&T or that they are on the space." *Id.* Defendant again followed up saying he was "still concerned about AT&T" and asking Mr. Maiorana if AT&T's status on the site would be subject to Plaintiff's due diligence. *Id.*, Ex.

4

7. Mr. Maiorana assured him that Plaintiff was conducting its own due diligence and Plaintiff did not make any representations or warranties to Plaintiff concerning AT&T. *Id.*

On August 7, 2014, Crown Castle sent Defendant a letter that stated "[d]uring the period of December 1, 2013 to March 21, 2014, payments were inconsistent with the lease due to license termination" and sought $11,471.97 from Defendant for Crown Castle's overpayment of rents. *Id.*, Ex. AA, ECF 92-28. An exhibit to the letter shows that Crown Castle paid lump sums for two rent streams on April 2013 (for the year between April 2013 and April 2014), but that the charges for one of those streams ended on December 1, 2013. *Id.* Defendant never provided Plaintiff with a copy of the letter. *Id.*, Ex. B at 117:12–119:7. Defendant did not otherwise inform Plaintiff prior to the closing that AT&T had not paid its 2014 rent or that he owed money to Crown Castle. *Id.* at 114:1–8. Also, prior to closing, Defendant provided Plaintiff with copies of the 2012 and 2013 rent checks but did not provide Plaintiff with a copy of the reduced 2014 rent check. *Id.* at 115:13–25; *id.*, Ex. V at 18:2–23.

On August 14, 2014, Defendant and Plaintiff signed a final purchase agreement, in which Plaintiff acquired the lease and Defendant received $925,000. *Id.*, Ex. BB, ECF 92-29. The sale closed on August 15, 2014. *Id.*, Ex. CC, ECF 92-30. The final purchase agreement included a "Mutual Indemnification Provision" and a "Dispute Resolution" provision whereby the parties agreed to waive the right to a jury trial. *Id.*, Ex. BB ¶¶ 9, 12.

Sometime after closing, Plaintiff discovered that no rent was being paid on the AT&T sublease. *Id.*, Ex. Y at 35:11–35:20. On March 14, 2016, Defendant received a letter from Plaintiff seeking rescission of the contract. The letter stated that Plaintiff planned to take legal action for the above-described events and detailed that AT&T was no longer on the lease as of November 30, 2013. Loskutoff Decl. ¶ 17, Ex. 9. In early April 2016, Defendant reached out to the Crown Castle Help Desk about AT&T's termination of its sublease, and a Crown Castle employee responded saying he didn't "see anything in the lease which required Crown to provide notice of ATT's decommission from the site," but he was following up with others to see if notification was sent. *Id.* ¶ 18, Ex. 10. Defendant responded asking when AT&T was removed from the site, and after being told AT&T had been removed on November 30, 2013, he asked

whether AT&T was discontinued the same day. *Id.* The record does not reflect that he received a response. Plaintiff filed this suit on April 29, 2016. ECF 1.

Defendant never received a notice of termination from AT&T. Ballesteros Decl., Ex. 1 at 83:10–84:10. Likewise, Crown Castle never provided written confirmation to Defendant that AT&T had terminated the sublease, though it customarily confirmed with its clients when there was a termination. *Id.*, Ex. 10 at 17:8–12; *id.*, Ex. 1 at 83:17–19; Loskutoff Decl. ¶ 7.

Throughout the transaction, Plaintiff conducted due diligence for the transaction. Ballesteros Decl., Ex. 3 at 17:16–18:4. Plaintiff is in the business of purchasing leases like the one at issue here. Compl. ¶¶ 1, 7. As part of this due diligence, the due diligence checklist on the transaction term sheet included "Proof of Payments (last 3 months)" and "Confirmation of Lease Economics." Saba Decl., Ex. X. An email between Plaintiff's employees in early June 2014 indicates that getting a copy of the 2014 rent check for the lease was a "first priority." Ballesteros Decl., Ex. 4. However, Plaintiff never received a copy of the 2014 rent check before closing. *Id.*, Ex. 1 at 115:13–17, Ex. 6 at 18:12–23; Loskutoff Decl. ¶ 15.

### B. Procedural History

Plaintiff filed its Complaint on April 29, 2016, alleging four causes of action: intentional misrepresentation, negligent misrepresentation, fraud by concealment, and breach of contract. Compl., ECF 1. On June 22, 2016, the case was reassigned to this Court. ECF 15. On July 5, 2016, Defendant answered the Complaint, asserting fourteen affirmative defenses and a counterclaim for rescission based on mutual mistake. Defendant asserted the following affirmative defenses (as interpreted by the Court):

1. Failure to state a claim
2. Assumption of risk
3. Failure to mitigate (failure to conduct due diligence prior to closing)
4. Failure to mitigate (after closing)
5. Unclean hands
6. Estoppel (Plaintiff knew the relevant facts)
7. Waiver
8. Comparative Fault (fault of others)
9. Failure to perform contractual duties
10. Laches
11. Estoppel (Plaintiff is estopped by its own conduct)

           12. Failure to conduct due diligence
           13. Rescission (by Plaintiff)
           14. Comparative fault (fault of Plaintiff)

Answer at 7–9, ECF 17.  On July 26, 2016, Plaintiff answered the counterclaim.  ECF 24.

On July 19, 2016, Defendant filed a third-party Complaint against then-Defendants STC Five LLC and Crown Castle International Corp. ("Crown Castle") for breach of contract, breach of the implied covenant of good faith and fair dealing, and implied contractual indemnity.  ECF 19. On October 27, 2016, Tower Company Five LLC ("Sprint"), by its attorney in fact Global Signal Acquisitions II LLC (which Defendant had misidentified as Crown Castle) and STC Five LLC, answered the third-party Complaint and asserted three counterclaims for breach of contract, mistaken receipt, and breach of the covenant of good faith and fair dealing.  ECF 53.  On November 28, 2016, Defendant answered Sprint's counterclaim.  ECF 57.  On April 27, 2017, the parties stipulated to dismissal of Defendant's third-party Complaint and the associated counterclaim, leaving just Plaintiff and Defendant in the case.  ECF 61.

On November 29, 2018, Plaintiff filed a motion for summary judgment, seeking summary adjudication of Defendant's affirmative defenses and his counterclaim for rescission.  *See generally* Mot.  The Court heard oral argument on January 7, 2019.

## II.    EVIDENTIARY OBJECTIONS

Each party objects to certain evidence used or statements made by the other party in their respective briefs.  The Court does not consider objections to attorney argument, as opposed to objections to evidence submitted by the opposing party.  Defendant almost exclusively objects to attorney argument that the Court declines to rule on individually.  However, the Court will not consider arguments that misstate the underlying evidence and will consider only the evidence itself.  The Court resolves objections to evidence in the table below, with citations to the evidence supplied by the Court where not otherwise supplied by the objecting party.

///

///

///

**Defendant's Objections**

| Citation (in Mot. Decls.) | Objection | Ruling |
|---|---|---|
| Saba Decl., Ex. R at 7:25–8:3: "Q. So you told Michael Loskutoff on April 23, 2014 that AT&T had terminated its co-location agreement on that tower; is that correct? A. Correct, sir. | Lacks Foundation; Speculative; Misstates Testimony | OVERRULED.<br>Ms. Egercic has personal knowledge of the phone call, as she was a participant, and she answered "correct" when asked if she told Defendant that AT&T had terminated. *See* Saba. Decl. , Ex. R at 10:21–24.  The Court recognizes that Ms. Egercic also testified that she had no independent recollection of the phone call, *id.* at 8:11–13, and takes this fact into account in the analysis below. |

**Plaintiff's Objections**

| Citation (in Opp. or Decls.) | Reason for Objection | Ruling |
|---|---|---|
| Declaration of Michael J. Loskutoff ("Loskutoff Decl.") ¶ 6 (2:14–16) – "The amount of payment confused me at the time, and I made several attempts to contact Crown Castle to determine the mix-up." | Lack of foundation, speculative, lack of personal knowledge (FRE 602); Best Evidence Rule (FRE 1002). | OVERRULED.<br>Defendant has personal knowledge of his own state of mind and any attempts he made to contact Crown Castle. |
| Loskutoff Decl. ¶¶ 19–23, Exs. 11–14. (Pre-litigation communications exchanged between Plaintiff and Defendant's counsel regarding possible settlement.) | Improper hearsay evidence (FRE 801, 802); Improper evidence of compromise offers and negotiations (FRE 408) | SUSTAINED, under Rule 408, to the extent the evidence is offered to prove or disprove the validity or amount of a disputed claim.<br><br>OVERRULED otherwise.<br>The statements do not constitute hearsay because they are statements by an opposing party.  F.R.E. 801(d)(2). |
| Declaration of Dan Ballesteros ("Ballesteros Decl.") ¶ 2, Ex. 1 (116:11–13) – "Even John Mondragon I asked him one time on a phone call, 'Is AT&T on the site?' He goes, 'Yeah. Sure.' So one of those things." | Improper hearsay evidence (FRE 801, 802); Lack of foundation, speculative, lack of personal knowledge (FRE 602) | OVERRULED.<br>The evidence is not introduced to prove the truth of the matter asserted, but rather is introduced for relevant, nonhearsay purposes. |
| Ballesteros Decl. ¶ 13, Ex. 12 (127:2–16) – "The structure of the transaction was the transaction was structured in such a way at Telecom Lease Advisors' request | Lack of foundation, speculative, lack of personal knowledge (FRE 602); Improper lay | SUSTAINED.<br>Mr. Maiarano cannot speculate as to Plaintiff's belief or intent with respect to the structure of the transaction.  He also states that |

| | | |
|---|---|---|
| that Telecom Lease Advisors believed it would not trigger any Crown Castle right of first refusal. They convinced Mike not to go to Crown Castle to -- with the right of first refusal -- with the notice required by the right of first refusal, and Mike agreed to do that only if he were indemnified by Telecom Lease Advisors for any potential liability should Crown Castle claim he breached the right of first refusal provision and seek recourse." | witness testimony (FRE 701–703) | Plaintiff convinced Defendant not to do something, but he does not say which of Plaintiff's employees instructed Defendant in this way. And the Court does not have enough information about Mr. Maiarano's qualifications to say that he can speak to the structure and outcomes of the transaction. |

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  The Court draws all reasonable inferences in favor of the party against whom summary judgment is sought. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried."  *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) (citing *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In order to meet its burden, the moving party must "either produce evidence negating an essential element of the nonmoving party's claim or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  In judging evidence at the summary judgment stage, "the Court does not make credibility

determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d 626, 630).

A material fact is one that could affect the outcome of suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). The court "determines whether the non-moving party's specific facts, coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party." *E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, 590 F. Supp. 2d 1244, 1250 (N.D. Cal. 2008) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d 626, 631). If the Court finds that a reasonable jury could find for the non-moving party, summary judgment is inappropriate. *See, e.g.*, *Anderson*, 477 U.S. at 248. Conclusory and speculative testimony, however, is insufficient to defeat summary judgment. *See, e.g.*, *Soremekum v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

## IV. DISCUSSION

Plaintiff seeks summary judgment of all of Defendant's affirmative defenses and his counterclaim for rescission. *See generally* Mot. The Court first holds that there are two key genuine issues of material fact relevant to the present motion: (1) whether Defendant knew that AT&T had terminated its sublease prior to closing the deal with Plaintiff; and (2) whether Plaintiff was negligent in conducting its due diligence. The Court then turns to each of Defendant's affirmative defenses and his counterclaim and GRANTS IN PART AND DEFERS RULING ON IN PART Plaintiff's motion for summary judgment.

### A. Genuine Issues of Material Fact

#### 1. Whether Defendant Knew that AT&T Had Terminated Its Sublease Is a Disputed Issue of Material Fact

Plaintiff argues that several of Defendant's affirmative defenses are barred because

Defendant knew that AT&T had terminated its sublease and fraudulently withheld that information from Plaintiff. *See, e.g.*, Mot. at 11–12. Thus, whether Defendant knew that AT&T had terminated its sublease at the time the deal with Plaintiff closed is an important question of fact here. At bottom, Plaintiff argues that Defendant knew that AT&T was no longer on the lease based on his actions between April 2014 (when he received the reduced check) and August 14, 2014 (when the deal closed). The Court disagrees and holds that whether Defendant knew that AT&T had terminated its sublease is a genuine issue of material fact that cannot be resolved on summary judgment.

As an initial matter, Defendant did not have any agreement with AT&T directly, the lease did not require Sprint to inform Defendant if AT&T terminated its lease, and Sprint never sent a written termination letter to Defendant. *See* Saba Decl., Ex. F; Loskutoff Decl. ¶¶ 4, 7; Ballesteros Decl., Ex. 1 at 83:17–19. Defendant also testifies that he was never told that AT&T was off the lease until March 2016. *See, e.g.*, Saba Decl., Ex. B at 58:17–59:20; 71:15–72:15, 73:13–77:15; 93:18–94:3.

In April 2014, Defendant received a rent check that was approximately half as large as the checks he had received in the previous four years. *See* Saba Decl., Exs. I–P. After receiving this check, Defendant called the Crown Castle Help Desk to ask about the discrepancy, at which time he spoke with Ms. Egercic. Ms. Egercic logged the call, saying "it appears AT&T terminated" and "it appears that we received notice from AT&T however LL [Defendant] indicated he was not notified." *Id.*, Ex. S. Plaintiff asserts that Ms. Egercic testified at her deposition that she told Defendant on this call that AT&T was no longer on the tower. *See id.*, Ex. R at 7:25–8:3. But Ms. Egercic also testified that she did not have any independent recollection of the phone call and was instead answering based solely on the text of the log. *See* Ballesteros Decl., Ex. 10 at 8:11–13; 14:12–15:5. The log itself does not actually state that she told Defendant that AT&T was not on the lease. And, as discussed more below, over the course of the next several months (and indeed years) on several occasions Defendant made several communications regarding whether AT&T was still on the lease, from which the Court may infer in favor of the nonmovant that Defendant was uncertain of AT&T's status. Given these facts, the Court finds there is a genuine issue of

11

material fact as to whether Ms. Egercic told Defendant that AT&T had terminated its sublease.

Defendant then emailed with Ryan Hull of Crown Castle on May 5, 2014 to verify who was using the cell tower. Saba Decl., Ex. T. As with Ms. Egercic, there is no definitive evidence that Mr. Hull told Defendant that AT&T had terminated its sublease. What Mr. Hull said was, "I don't show AT&T as being installed on the tower any longer," *id.*, to which Defendant responded questioning when AT&T came off the tower. *Id.* Mr. Hull never responded to this email. A reasonable jury could infer that Defendant did not know that AT&T terminated its sublease because Mr. Hull never said so definitively and never responded to Defendant's follow-up.

Throughout the next several months, Defendant interacted with Plaintiff's employee, Mr. Mondragon, through at least one phone call, the application for the lease sale with Plaintiff, and the signing of the final term sheet. *Id.*, Ex. X–Z. There is no evidence that Defendant somehow learned of AT&T's status throughout that time. In fact, Defendant testified that Mr. Mondragon told him that AT&T *was* still on the tower. *See* Ballesteros Decl., Ex. 1 at 116:11–13. And in late-July 2014, Defendant had conversations with his attorney, Mr. Maiorana, in which he expressed his concern that AT&T was not on the lease, stating, in part, "I have an agreement with AT&T but I can not honestly tell you they are on the cell tower or off the cell tower. They do not give me notice as to who is on or off the tower." Loskutoff Decl., Ex. 6; *see also id.*, Ex. 7. Thus, a genuine issue of material fact exists as to whether Defendant knew by this point that AT&T had terminated its sublease.

Finally, on August 7, 2014, Crown Castle sent Defendant a letter describing that it had overpaid Defendant for the previous year's rent and showing that one of the two rent streams for the lease had ended in November 2013. Saba Decl., Ex. AA. However, the letter did not explicitly state that AT&T had terminated its sublease. Defendant also testified that he thinks he received this letter after the closing on August 14, 2014. *Id.*, Ex. B at 114:10–115:3. Thus, there are disputed issues of material fact as to whether this letter informed Defendant before the closing that AT&T had terminated its sublease. This conclusion is further supported by the fact that in April 2016, after receiving Plaintiff's notice of litigation, Defendant followed up with Crown Castle to determine when AT&T had terminated its sublease. *See* Loskutoff Decl. ¶ 18, Ex. 10.

Finally, the Court cannot infer that Defendant knew that AT&T had terminated the sublease merely because (1) he may have told Mr. Mondragon that AT&T was on the lease; (2) he signed the purchase application saying AT&T was on the lease; (3) he failed to provide the 2014 rent check to Plaintiff; or (4) he otherwise did not inform Plaintiff that AT&T had terminated the lease. *See* Mot. at 11–12. Whether any of these actions indicate that Defendant knew about AT&T's status is a genuine issue of material fact. *See, e.g.*, Ballesteros Decl., Ex. 1 at 116:1–10.

Thus, there are disputed issues of material facts as to whether Defendant knew before the closing that AT&T had terminated its sublease. Given the above facts, a reasonable jury could conclude that Defendant did not know.

### 2. Whether Plaintiff Was Negligent in Conducting Its Due Diligence Is a Disputed Issue of Material Fact

Defendant argues that a genuine issue of material fact exists as to whether Plaintiff (through its agent TLA) negligently conducted its due diligence, such that it should have discovered that AT&T was no longer on the lease. Defendant submits expert testimony stating that Plaintiff's due diligence "fell below the standard of care because they failed to obtain a copy of the 2014 rent stream or an estoppel confirming the rent payment." Opp. at 9 (citing Ballesteros Decl., Ex. 7 at 57:22–58:22, 72:15–21, 74:1–18, 75:19–76:8, 76:24–77:9, 101:19–102:1). Defendant argues that TLA is in the business of purchasing these types of leases, such that it has vast experience in closings such as these. Compl. ¶¶ 1, 7. Indeed, the due diligence checklist on the transaction term sheet included "Proof of Payments (last 3 months)" and "Confirmation of Lease Economics," indicating that TLA contemplated securing the 2014 rent check. Saba Decl., Ex. X. Likewise, Defendant references the email between Plaintiff's employees in early June 2014 that indicated that getting a copy of the 2014 rent check for the lease was a "first priority." Ballesteros Decl., Ex. 4. However, Plaintiff never received a copy of the 2014 rent check before closing. *See id.*, Ex. 1 at 115:13–17, Ex. 6 at 18:12–23; Loskutoff Decl. ¶ 15.

Plaintiff counters that it did not have access to the tower to confirm whether AT&T was still on it. Reply at 6 (citing Saba Decl., Ex. B, at 22:10–23:9; 55:7–55:12; 142:19–144:13). Plaintiff also avers that it is common practice not to receive all pay stubs in a transaction and

instead to rely on representations and warranties in the agreement. *See* Saba Decl., Ex. V at 18:2–19:25, ECF 92-23. According to Plaintiff, that is why it reasonably relied on the 2013 pay check and Defendant's representations and warranties in the agreement, as well as Defendant's statements to Mr. Mondragon that AT&T was still on the tower. *See* Mot. at 11; Reply at 7. Plaintiff also reiterates that it believes Defendant intentionally withheld the 2014 check. *Id.* And Defendant failed to inform Plaintiff at any time that AT&T was no longer on the tower. Mot. at 11–12.

Given this conflicting evidence, the Court finds that there is a genuine issue of material fact as to whether Plaintiff conducted its due diligence negligently. While Plaintiff says it is common practice not to receive all pay stubs, Defendant's expert says such a practice would be wholly insufficient. The express provisions of the term sheet contemplated Plaintiff confirming the lease payments, and Plaintiff's employees called getting the 2014 check a first priority. Plaintiff also did not get an estoppel from Defendant to mitigate any issues that might result from not receiving the 2014 rent check. Even in light of any alleged misrepresentation by Defendant, a reasonable jury could find on this evidence that Plaintiff was negligent in conducting its due diligence. As such, a genuine issue of material facts exists.

### B. Defendant's Affirmative Defenses and Counterclaim

#### 1. Affirmative Defense No. 1: Failure to State a Claim

Defendant's first affirmative defense alleges "[t]hat plaintiff does not state facts sufficient to constitute a cause of action against this Defendant." Ans. at 7. Defendant does not oppose summary judgment on this defense. *See generally* Opp.

"A defense which demonstrates that plaintiff has not met its burden of proof as to an element plaintiff is required to prove is not an affirmative defense." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). "Such a defense is merely rebuttal against the evidence presented by the plaintiff." *Id.* Several judges in this district have held that "[f]ailure to state a claim is not a proper affirmative defense but, rather, asserts a defect in [the plaintiff's] prima facie case." *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010); *accord Espitia v. Mezzetti Financial Srvs., Inc.*, No. 18-CV-02480-VKD, 2019

WL 359422, at *5 (N.D. Cal. Jan. 29, 2019). This Court agrees. The defense of failure to state a claim is, in essence, an argument that the plaintiff has not met its burden of alleging the elements of its claims.

As such, the Court GRANTS summary judgment on Defendant's first affirmative defense.

### 2. Affirmative Defense No. 2: Assumption of the Risk

Defendant's second affirmative defense alleges "[t]hat plaintiff voluntarily and with full knowledge of the matters referred to in said Complaint assumed any and all of the risks, hazards, and perils of the circumstances referred to in said Complaint and therefore assumed the risks of any injuries or damages sustained by said plaintiffs, if any at all." Ans. at 7. "This defense stands for the principle that one who takes on the risk of loss, injury, or damage cannot maintain an action against a party that causes the loss, injury, or damage." *Quintana v. Baca*, 233 F.R.D. 562, 566 (C.D. Cal. 2005).

Though the parties dispute the application of this defense based on the disputed issues of Defendant's knowledge of AT&T's status and Plaintiff's negligence in conducting due diligence, the Court finds this affirmative defense is an ill fit for this case based on the claims alleged. Other affirmative defenses that Defendant asserts more appropriately cover the same defenses.

"[T]he assumption of risk doctrine long has caused confusion both in definition and application, because the phrase 'assumption of risk' traditionally has been used in a number of very different factual settings involving analytically distinct legal concepts." *Knight v. Jewett*, 3 Cal. 4th 296, 303 (1992). It is a defense applied in various types of tort cases, such as in cases "concerned with defining the contours of the legal duty that a given class of defendants—for example, owners of baseball stadiums or ice hockey rinks—owed to an injured plaintiff" and in cases in which "the defendant had breached a legal duty of care to the plaintiff, and the inquiry focused on whether the plaintiff knowingly and voluntarily had chosen to encounter the specific risk of harm posed by the defendant's breach of duty." *Id.* at 303–04. These types of cases are not readily comparable to what is essentially a contract dispute here.

In any event, the California Supreme Court has held that the assumption of the risk doctrine has merged into the comparative negligence scheme, except where "the defendant's

United States District Court
Northern District of California

conduct did not breach a legal duty of care to the plaintiff." *Id.* at 306; *see also* Assumption of the Risk, *Black's Law Dictionary* (10th ed. 2014) ("Assumption of the risk was originally an affirmative defense, but in most jurisdictions it has now been wholly or largely subsumed by the doctrines of contributory or comparative negligence."). In this respect, Defendant's assumption of the risk affirmative defense is more appropriately considered as part of his comparative fault affirmative defenses.

Likewise, the parties' own cases demonstrate that this is not the appropriate affirmative defense here, but instead is more appropriately considered as part of the element of justifiable reliance for the misrepresentation and fraud claims. The only case Plaintiff cites discusses the parties' states of mind as being relevant to the element of justifiable reliance in an intentional misrepresentation claim, not as an affirmative defense to such a claim. *See Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1502 (2007). Though Defendant does not cite a single case in support of its argument, at oral argument his attorney cited a California Supreme Court case that similarly analyzed the argument with respect to the element of justifiable reliance for a fraud claim. *See Jue v. Smiser*, 23 Cal. App. 4th 312, 316–19 (1994), *as modified on denial of reh'g* (Apr. 15, 1994). As discussed above, a defense that "demonstrates that [a] plaintiff has not met its burden of proof as to an element plaintiff is required to prove" is not an affirmative defense. *Zivkovic*, 302 F.3d at 1088.

Because the underlying arguments of this affirmative defense are more appropriately considered with respect to other affirmative defenses or the element of justifiable reliance in Plaintiff's claims, the Court GRANTS summary judgment on Defendant's second affirmative defense.

### 3. Affirmative Defense No. 3: Failure to Mitigate (Failure to Perform Due Diligence Before Closing)

Defendant's third affirmative defense alleges "[t]hat plaintiff, with the exercise of reasonable diligence and effort, would have and could have mitigated the damages alleged in the Complaint, if indeed any there are; that the resultant damages, if any, complained of in said Complaint were directly and proximately caused by the failure, negligence and refusal of Plaintiff

to exercise reasonable diligence in an effort to mitigate the damages alleged." Ans. at 7.

Plaintiff argues that any negligence during due diligence on its part cannot negate a claim for fraud against Defendant. *See* Mot. at 13. Defendant responds by arguing that "comparative fault principles do apply to negligent misrepresentation claims" and that "triable issues of fact exist as to whether Plaintiff's reliance on Loskutoff's 'representations' was justifiable." Opp. at 20.

As with the assumption of the risk defense, the Court finds this "failure to mitigate" affirmative defense is more appropriately considered with respect to other asserted defenses requiring the same proof and providing the same remedy. Defendant's arguments and Plaintiff's opposition thereto make clear that this is really a dispute over the comparative fault affirmative defenses, discussed below. Likewise, to the extent Defendant argues that the defense is appropriate because Plaintiff's reliance on Defendant's alleged misrepresentations was not justifiable, the defense is simply a guise for Defendant's argument that Plaintiff has failed to prove an element of its claim. *See Zivkovic*, 302 F.3d at 1088. Indeed, Defendant does not cite a single case allowing a "failure to mitigate" claim for failure to conduct due diligence *before* closing a contract. *See* Mitigation-of-Damages Doctrine, *Black's Law Dictionary* (10th ed. 2014) ("The principle inducing a plaintiff, *after an injury or breach of contract*, to make reasonable efforts to alleviate the effects of the injury or breach." (emphasis added)).

Because the underlying arguments of this affirmative defense are more appropriately considered with respect to other affirmative defenses, the Court GRANTS summary judgment on Defendant's third affirmative defense.

### 4. Affirmative Defense No. 4: Failure to Mitigate (After Closing)

Defendant's fourth affirmative defense alleges "[t]hat plaintiff failed subsequent to the occurrence described in their Complaint to properly mitigate the damages and thereby are precluded from recovering those damages that could have reasonably been avoided by the exercise of due care on the plaintiff's part." Ans. at 7.

Defendant argues that Plaintiff failed to mitigate its damages after closing the transaction by "failing to engage in good faith settlement discussions." Opp. at 20 (citing *Emelianko v.*

*Affliction Clothing*, No. 09-07865-MMM, 2011 WL 13176755 (C.D. Cal. July 28, 2011)). Defendant cites a series of communications between Defense counsel and Plaintiff's counsel in which Defendant alleges he offered to rescind the contract, and Plaintiff's counsel agreed but then changed the demanded amount Defendant would have to pay. *See* Loskutoff Decl. ¶¶ 19–23, Exs. 11–14. Plaintiff objected to this evidence, as set forth above, and also argues that these discussions do not demonstrate a failure to mitigate, but instead show only that the parties could not reach a satisfactory compromise. Defendant did not have an opportunity to substantively respond to these objections.

Based on the limited briefing on this issue, the Court cannot say for certain whether Defendant's intended use of this evidence runs afoul of Federal Rule of Evidence 408. The Court recognizes that various courts have held that statements during settlement discussions may be admissible for the purpose of demonstrating a failure to mitigate. *See, e.g.*, *Emelianenko*, 2011 WL 13176755, at *15; *Hutton v. City of Fairbanks*, No. 4:08-CV-00029 RRB, 2012 WL 13032925, at *1 (D. Alaska Oct. 16, 2012); *Thomas v. Resort Health Related Facility*, 539 F. Supp. 630, 638 (E.D.N.Y. 1982). However, it seems that Defendant intends to use this evidence to prove that Plaintiff should have rescinded the agreement—a use that appears distinguishable from other cases admitting such evidence and that appears to contravene the purposes of Rule 408. Because this is the only evidence Defendant submits in support of this defense, resolution of the defense turns on this evidentiary dispute. As such, this issue is more appropriately considered through a motion in limine. *See Mastec N. Am., Inc. v. Coos Cty.*, No. CIV 04-278-AA, 2007 WL 2027011, at *8 (D. Or. July 6, 2007) ("Ultimately, whether plaintiffs can introduce their May 24 offer to show Coos County's failure to mitigate damages is an evidentiary issue properly raised in a motion in limine rather than a motion for summary judgment.")

Because the arguments on this affirmative defense would be more appropriately presented in a motion in limine, the Court DEFERS RULING ON Defendant's fourth affirmative defense. It will be Defendant's responsibility to submit a motion in limine to obtain admission of the settlement discussions, which must include a more developed discussion of his theory of a failure to mitigate that is in line with an exception to FRE 408. If the Court rules that this evidence is

inadmissible on a motion in limine, Defendant's failure-to-mitigate defense will have no supporting evidence, and the Court will summarily dismiss the affirmative defense at that time.

### 5. Affirmative Defense No. 5: Unclean Hands

Defendant's fifth affirmative defense alleges "[t]hat plaintiffs' claims herein are barred by the equitable doctrine of unclean hands." Ans. at 8. The doctrine of unclean hands is a "maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* Though the party against whom unclean hands is enforced need not have acted unlawfully, the court may only apply the doctrine where the party committed a "willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct." *Id.* at 815. "Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 979 (1999), *as modified on denial of reh'g* (Jan. 3, 2000).

Defendant asserts two theories as to why Plaintiff has unclean hands: (1) Plaintiff failed to perform sufficient due diligence; and (2) Plaintiff attempted to circumvent the lease's requirements that Defendant notify Crown Castle of its right of first refusal. *See* Opp. at 21.

These theories are easily disposed of. As to the first, the evidence supports, at most, a finding of negligence by Plaintiff in its due diligence. Defendant cites no evidence supporting the argument that this failure was somehow made in bad faith. As to the latter, the Court has excluded Defendant's only evidence to support this argument—testimony from Defendant's attorney that Plaintiff structured the transaction to avoid triggering the notice requirement, Ballesteros Decl. ¶ 13, Ex. 12 at 127:2–16. Defendant presents no other evidence that Plaintiff acted with unclean hands in the way in which it conducted the transaction, and no reasonable juror could find that Plaintiff acted with unclean hands.

As such, the Court GRANTS summary judgment on Defendant's fifth affirmative defense.

///

### 6. Affirmative Defense No. 6: Estoppel (Plaintiff Knew the Relevant Facts)

Defendant's sixth affirmative defense alleges "[t]hat plaintiff is barred in whole or in part by the doctrine of estoppel in that plaintiff closed escrow on the subject property with knowledge of the facts and circumstances alleged." Ans. at 8. Equitable estoppel requires: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Schafer v. City of Los Angeles*, 237 Cal. App. 4th 1250, 1261 (2015) (citation omitted).

Defendant argues that Plaintiff is equitably estopped from bringing its claims here because "Plaintiff executed the purchase agreement knowing that AT&T might not be on the cellular tower." Opp. at 22. To support this assertion, Defendant asserts that (1) Plaintiff "knew it did not have the 2014 rent payment check" and (2) Plaintiff's agent, TLA, "informed Loskutoff that AT&T was still on the cellular tower." *Id.*

Put simply, there is no evidence that Plaintiff "was apprised of the fact[]" that AT&T was not on the tower before the closing. At most, the evidence supports a finding that Plaintiff was negligent in not receiving the 2014 rent check, not that Plaintiff knew about AT&T's status simply because it had not received the check. Indeed, the fact that Mr. Mondragon told Defendant that AT&T was still on the tower is evidence that Plaintiff believed AT&T *was* on the tower, not that Plaintiff knew AT&T had terminated its sublease. Perhaps if additional evidence existed to support the notion that Plaintiff knew of AT&T's status, then Mr. Mondragon's statement might indicate that Plaintiff was trying to mislead Defendant, but absent any such evidence, no reasonable jury could find that Plaintiff knew AT&T's status before closing and attempted to mislead Defendant as to that status. Moreover, even if Defendant had submitted evidence to support the argument that Plaintiff acted knowingly and that he was misled, Defendant has failed to demonstrate that he was injured by the transaction, as discussed in more detail with respect to Defendant's rescission claim. Finally, Defendant's contentions more properly relate to the issue of reasonable reliance, which is an element of Plaintiff's case in chief and not an affirmative defense.

As such, the Court GRANTS summary judgment on Defendant's sixth affirmative defense.

### 7. Affirmative Defense No. 7: Waiver

Defendant's seventh affirmative defense alleges "[t]hat plaintiffs' claims are barred in whole or in part by the doctrine of waiver in that plaintiffs closed escrow on the subject property with full knowledge of the condition of the property and all material facts pertaining thereto." Ans. at 8. Waiver is "the intentional relinquishment or abandonment of a known right." *Lynch v. California Coastal Com.*, 3 Cal. 5th 470, 475 (2017), *reh'g denied* (Aug. 9, 2017) (citation omitted). For a court to hold that a party has waived its rights, the court must find "an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.'" *Id.* (quoting *Bickel v. City of Piedmont*, 16 Cal. 4th 1040, 1053 (1997)). "Waiver always rests upon intent." *Id.* (quoting *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107 (1966)).

Defendant's arguments as to waiver are identical to his estoppel arguments. *See* Opp. at 22. As the Court discussed with respect to the estoppel defense, Defendant has provided no evidence that Plaintiff knew of AT&T's termination, much less that it intentionally and knowingly abandoned any rights under the contract because of such knowledge.

For this reason, the Court GRANTS summary judgment on Defendant's seventh affirmative defense.

### 8. Affirmative Defense No. 8: Comparative Fault: Fault of Others

Defendant's eighth affirmative defense alleges "[t]hat plaintiff's damages, if any exist, were caused by the negligence and/or fault of other persons, corporations, and entities including both parties and non-parties to this action whether named or not named and that Defendant's liability, if any, should be reduced accordingly." Ans. at 8. Defendant raises a similar affirmative defense in his fourteenth affirmative defense, which alleges, in part, that plaintiff was contributorily negligent. To avoid duplication of the defenses, the Court interprets Defendant's eight affirmative defense to apply only to non-parties—that is, that Defendant's liability should be reduced due to the fault of others (*i.e.*, non-parties).

The problem here is that there is no "other" against whom comparative fault may operate. The only relevant party would be Plaintiff's due diligence agent TLA. The parties implicitly and

explicitly recognize that TLA conducted its due diligence as Plaintiff's agent. *See, e.g.*, Opp. at 8, 15, 22 (referring to Plaintiff's agents); Mot. at 13, 14 (stating that Plaintiff conducted due diligence without referring to TLA). Under California law, the comparative fault of an agent is imputed to the principal. *See* Council of Cal. Advisory Comm. Civil Jury Instruction No. 3702 (setting forth the elements for "Affirmative Defense – Comparative Fault of Plaintiff's Agent," and requiring that if the defendant can prove the agent was negligent and acted within the scope of its duties, the plaintiff's claim is reduced by the percentage of the agent's responsibility). Thus, because Plaintiff does not dispute that TLA acted as its agent, any negligence on the part of TLA is more appropriately considered as negligence by Plaintiff. The Court discusses the comparative fault standards as to Plaintiff below with respect to Defendant's fourteenth affirmative defense.

Defendant does not argue that TLA is more appropriately considered a "joint tortfeasor" (or co-defendant, in a sense). As such, his cites to *Kohn v. Superior Court*, 142 Cal.App.3d 323, 330 (1983) and *Baird v. Jones*, 21 Cal. App. 4th 684, 690 are inapposite. Opp. at 16–17. Those cases concern the actions of joint tortfeasor defendants, not plaintiffs or their agents.

Thus, the Court finds that Defendant has not submitted any evidence of fault by another that is not contributable to Plaintiff, which he raises independently in his fourteenth affirmative defense. Accordingly, the Court GRANTS summary judgment on Defendant's eight affirmative defense.

### 9. Affirmative Defense No. 9: Failure to Perform Contractual Duties

Defendant's ninth affirmative defense alleges "[t]hat plaintiff failed to perform their [sic] duties under the contract." Ans. at 7. Defendant argues that Plaintiff breached its contractual duties because the purchase agreement stated that each party waived its right to a jury trial, *see* Saba Decl., Ex. BB ¶¶ 9, 12, but Plaintiff seeks a jury trial here, *see* Compl. ¶ 66. *See* Opp. at 22–23.

The purchase agreement states in its Dispute Resolution provision that "[t]his agreement shall be governed and construed in accordance with the laws of the State where the Parent Parcel is located." Saba Decl., Ex. BB ¶ 12. The "Parent Parcel" is defined as the Property at 1391 Geneva Dr., Sunnyvale, CA 94089. *Id.* at 1. Thus, California law applies. *See also*, Mot. at 12–

13 (making arguments under California law); Opp. at 16–17 (same).

Under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies state law to determine the validity of a pre-dispute jury trial waiver contained in a contract governed by California law. *See In re Cty. of Orange*, 784 F.3d 520, 523 (9th Cir. 2015). "Under California . . . law, parties to a contract cannot waive their right to a jury trial before a dispute commences, and any contract provision seeking to effect such a waiver is unenforceable unless expressly authorized by statute." *Id.* (citing *Grafton Partners, L.P. v. Superior Court*, 36 Cal. 4th 944 (2005)). The relevant statute, Cal. Civ. Proc. Code § 631, delineates "six means by which the right to jury trial may be forfeited or waived, including failure to appear at trial, failure to demand jury trial within a specified period after the case is set for trial, failure to pay required fees in advance or during trial, oral consent in open court, or written consent filed with the clerk or the court." *Grafton*, 36 Cal. 4th at 951. Defendant does not argue that any of these means is at issue here, nor could he, since the *Grafton* Court explicitly held that pre-dispute jury trial waivers are unenforceable.

As such, the Court GRANTS summary judgment on Defendant's ninth affirmative defense.

### 10. Affirmative Defense No. 10:  Laches

Defendant's tenth affirmative defense alleges "[t]hat plaintiffs' claims herein are barred by the equitable doctrine of laches." Ans. at 7. Defendant does not oppose summary judgment on this defense. *See generally* Opp.

Laches is the "unreasonable, prejudicial delay in commencing suit." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014). "A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Id.* Put simply, Defendant has not submitted any evidence demonstrating that Plaintiff unreasonably delayed in bringing this suit or that Defendant was prejudiced by any such delay. Plaintiff brought this suit in April 2016, less than two years after the transaction was completed. Such a delay was not unreasonable. And Plaintiff does not argue how this delay may have prejudiced him.

As such, the Court GRANTS summary judgment on Defendant's tenth affirmative defense.

### 11. Affirmative Defense No. 11:  Estoppel (Plaintiff Is Estopped by Its Own Conduct)

Defendant's eleventh affirmative defense alleges "[t]hat plaintiffs [sic] are estopped by their own conduct from pursuing their claims set forth herein."  Ans. at 9.

This estoppel defense is barred for the same reasons as Defendant's previous estoppel defense (No. 5) and his unclean hands defense (No. 4).  Defendant fails to marshal any evidence that Plaintiff acted knowingly in any failures it may have made in conducting due diligence, making representations to Plaintiff, or structuring or closing the deal.

As such, the Court GRANTS summary judgment on Defendant's eleventh affirmative defense.

### 12. Affirmative Defense No. 12:  Failure to Conduct Due Diligence

Defendant's twelfth affirmative defense alleges "[t]hat plaintiff failed to properly conduct due diligence and therefore could not have reasonably relied on defendant's statements or representations, if any."  Ans. at 9.

Defendant argues that this defense "seeks a complete bar on Plaintiff's claims on the grounds that Plaintiff cannot prove 'justifiable reliance' on Loskutoff's alleged misrepresentation. Reliance is a key element that Plaintiff must prove to prevail on both its fraud and negligent misrepresentation causes of action."  Opp. at 19.

Thus, as with his defenses for assumption of the risk and failure to mitigate before contracting, this defense is not appropriate because it is simply a guise for Defendant's argument that Plaintiff has failed to prove an element of its claim.  *See Zivkovic*, 302 F.3d at 1088. Accordingly, the Court GRANTS summary judgment on Defendant's twelfth affirmative defense.

### 13. Affirmative Defense No. 13:  Rescission (by Plaintiff)

Defendant's thirteenth affirmative defense alleges "[t]hat plaintiff rescinded the agreement."  Ans. at 9.  In his opposition, Defendant does not cite any evidence to support this defense, but he states that "[t]he record establishes that upon Plaintiff learning of the fact that AT&T was no longer on the cellular tower, it demanded rescission of the Purchase Agreement" and that "Loskutoff agreed to rescind the Purchase Agreement."  The Court can only assume Defendant is referring to Plaintiff's March 14, 2016 notice of litigation letter.  On March 14, 2016,

Plaintiff sent the following letter to Defendant, in which Plaintiff stated: "LLB is hereby demanding a return of the total acquisition cost in the amount of Nine Hundred Eighty-Four Thousand Four Hundred Three Dollars ($984,403.00) to unwind the sale of the Lease. In exchange for immediate repayment of the total acquisition cost, LLB will assign you its interest in the Lease and will execute a settlement agreement, releasing all claims." Loskutoff Decl., Ex. 9; Ans. at 12, ¶ 24. In the ensuing settlement discussions, Defendant never offered to refund the total acquisition cost of $984,403.00. *Id.*, Exs. 11–14.

"A party to a contract has two different remedies when it has been injured by a breach of contract or fraud and lacks the ability or desire to keep the contract alive. The party may disaffirm the contract, treating it as rescinded, and recover damages resulting from the rescission" or "affirm the contract, treating it as repudiated, and recover damages for breach of contract or fraud." *Wong v. Stoler*, 237 Cal. App. 4th 1375, 1384 (2015), *as modified on denial of reh'g* (June 23, 2015). To disaffirm the contract, the rescinding party must follow the procedure set forth in California Civil Code § 1691. *See id.* Specifically, the rescinding party must "(a) [g]ive notice of rescission to the party as to whom he rescinds; and (b) [r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise . . . ." Cal. Civil Code § 1691. Notice of rescission need not "be formal and explicit" but it must "clearly show[] the intention of the person rescinding to consider the contract at an end." *Wilson v. Lewis*, 106 Cal. App. 3d 802, 809 (1980).

The Court holds that Defendant has not provided sufficient evidence for a reasonable jury to conclude that Plaintiff rescinded the contract. Defendant's only evidence (which he does not cite) appears to be the March 14, 2016 letter. But this letter does not "clearly show [an] intention" to rescind. First, Plaintiff never says it wishes to "rescind" or "repudiate" the contract. *Cf. Wilson*, 106 Cal. App. 3d at 809 (using term "repudiate" was sufficient notice of rescission). Second, Plaintiff sought $984,403.00 from Defendant in March 2016, but the purchase price was $925,000. *See* Saba Decl., Ex. BB. Thus, Plaintiff sought damages beyond mere rescission of the purchase price. Third, Plaintiff listed the claims it would bring against Defendant, which did not include a claim for rescission. *Id.* Indeed, Plaintiff's complaint, filed less than 2 months later,

25

does not seek rescission of the contract. *See generally* Compl. Moreover, Plaintiff engaged in negotiations with Defendant just ten days after it sent this letter in which Plaintiff offered Defendant $550,000 and noted that "a full rescission would be difficult to accomplish." Loskutoff Decl., Ex. 12. Given these facts, no reasonable jury could find that Plaintiff intended to and did rescind the contract in March 2016. Other courts have held that letters threatening to file a legal action absent additional evidence does not constitute notice of rescission. *See Mathew v. Walt Disney Co.*, No. 14-CV-07832-RGK, 2015 WL 12830442, at *3 (C.D. Cal. Apr. 20, 2015), *aff'd*, 690 F. App'x 509 (9th Cir. 2017).

Because Defendant has not provided sufficient facts from which a reasonable jury could conclude the Plaintiff rescinded the contract, the Court GRANTS summary judgment on Defendant's thirteenth affirmative defense.

### 14. Affirmative Defense No. 14: Comparative Fault

Defendant's fourteenth affirmative defense alleges "[t]hat plaintiff was contributorily negligent and that such negligence contributed to its injuries and damages, if any, and that plaintiff's recovery should therefore either be barred or reduced to the extent of said negligence." Ans. at 9. In *Li v. Yellow Cab Co.*, 13 Cal. 3d 804, 813 (1975), the California Supreme Court rejected (for almost all purposes) a contributory negligence scheme in California and adopted a comparative fault scheme, whereby "liability for damage [is] borne by those whose negligence caused it in direct proportion to their respective fault."

Plaintiff argues that comparative fault based on Plaintiff's alleged negligence is not a defense to any of Plaintiff's four causes of action: intentional misrepresentation, negligent misrepresentation, fraud by concealment, or breach of contract, Compl., ECF 1. First, as to the intentional misrepresentation and fraudulent concealment claims, Plaintiff argues that "[u]nder California law, negligence is not a defense to deceit." Mot. at 12–13 (citing *Manderville*, 146 Cal. App. 4th at 1502; *Seeger v. Odell*, 18 Cal. 2d 409, 414–15 (1941)). Second, Plaintiff cites case law demonstrating that comparative fault is not a defense to a breach of contract claim. *Id.* at 13 (citing *Kransco v. Am. Empire Surplus Lines Inc. Co.*, 23 Cal.4th 390, 402–03 (2000), *as modified* (July 26, 2000)). And third, Plaintiff argues that comparative fault is not a defense to negligent

26

misrepresentation because "the tort of negligent misrepresentation is a species of deceit," such that when the allegation of negligent misrepresentation is an allegation of deceit, "the question of whether the Defendant's behavior is intentional or negligent is subsumed under the element of reliance." *Id.* (citing *Bily v. Young*, 3 Cal.4th 370, 407 (1992); *Van Meter v. Bent Const. Co.*, 46 Cal.2d 588, 594–95 (1956)).

Defendant does not meaningfully dispute that comparative fault principles do not apply to torts of deceit. *Cf.* Opp. at 18 (arguing *Manderville* and *Seeger* hold only that comparative fault is not a defense to *intentional* misrepresentation, as opposed to *negligent* misrepresentation). Defendant argues instead that Plaintiff fails to demonstrate that comparative fault is not a defense to negligent misrepresentation. Specifically, Defendant argues that California has recognized the authority of Section 552 of the Restatement of Torts, which states that ordinary negligence rules apply to claims of negligent misrepresentation. Opp. at 17 (citing *Illinois Nat. Ins. Co. v. Nordic PCL Const., Inc.*, 2013 WL 5739639, *12 (D. Haw. Oct. 22, 2013)). Defendant recognizes that there is no California Supreme Court ruling on the issue, and that "California Courts of Appeal have come to varying conclusions." *Id.* Finally, Defendant argues that comparative fault may be a defense to contract claims, Opp. at 19 (citing *F.D.I.C. v. Warren*, 2011 WL 5079504, *1 (N.D. Cal. Oct. 25, 2011)), though he does not elaborate on the circumstances in which such a defense would be appropriate.

In reply, Plaintiff argues that *Kransco* controls, such that comparative fault is not a defense to a breach of contract claim. Reply at 9. Plaintiff also argues that the holding in *Carroll v. Gava*, 98 Cal. App. 3d 892 (1979) is the definitive authority on the issue of whether comparative fault is a defense to negligent misrepresentation and holds that it is not. Plaintiff points to West's Committee's California Civil Jury Instruction, *see* BAJI 12.45, which precludes an instruction of the affirmative defense in negligent misrepresentation claims. Reply at 8.

The Court holds that Plaintiff is correct: comparative fault is not a defense to any of Plaintiff's causes of action.

First, as to intentional misrepresentation and fraudulent concealment, California courts have definitively held that negligence is not a defense to claims based on intentional deception. In

*Manderville*, the defendants argued that the plaintiffs could not prove justifiable reliance (an element of intentional misrepresentation) as a matter of law because they had failed to conduct a more diligent investigation—precisely, Defendant's claim here. 146 Cal. App. 4th at 1502. The court rejected this argument, stating that "[i]t is well established in California that in an action for fraud or deceit, negligence on the part of the plaintiff in failing to discover the falsity of the defendant's statement is no defense when the misrepresentation was intentional." *Id. Manderville* relied on the California Supreme Court's decision in *Seeger v. Odell*, which conclusively held, again in the context of discussing justifiable reliance, that "[n]egligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." 18 Cal. 2d 409, 414–416; *accord Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995); *see also Onions Etc., Inc. v. Z & S Fresh, Inc.*, 603 F. App'x 567, 570 (9th Cir. 2015) ("[A] a finding of negligence is not fatal to their fraudulent misrepresentation claim."). The same rule applies to fraudulent concealment claims. *See Am. Gen. Life & Acc. Ins. Co. v. Findley*, No. CV 12-01753 MMM PSWX, 2013 WL 1120662, at *9 (C.D. Cal. Mar. 15, 2013) ("A plaintiff's contributory negligence is no defense to an intentional tort like fraud, however.") (citing *Godfrey v. Steinpress*, 128 Cal. App. 3d 154, 176 (1982); *Anderson v. Tacher*, 76 Cal.App.2d 50, 70, 172 P.2d 533 (1946)). Put simply, there is "an unbroken line of authority barring apportionment where . . . the defendant has committed an intentional tort and the injured plaintiff was merely negligent." *Heiner v. Kmart Corp.*, 84 Cal. App. 4th 335, 350 (2000).[2]

As to breach of contract claims, the California Supreme Court held in *Kransco* that an insurer could not invoke comparative fault principles against an insured where the insured had allegedly breached only its contractual covenant of good faith and fair dealing, whereas the insurer had allegedly breached its independent, non-contractual duty of good faith and fair dealing. 23 Cal. 4th at 402–03. In so holding, the Supreme Court recognized that "contractual breaches are

---

[2] Also, these cases often deal with this issue in the context of the justifiable reliance element of the misrepresentation claim, demonstrating that Defendant can still raise the same evidence to argue that Plaintiff did not justifiably rely on Defendant's alleged misrepresentations.

generally excluded from comparative fault allocations." *Id.* at 403; *see id.* at 413 (Mosk, J., concurring) ("Actions in contract do not allow an affirmative defense of comparative fault."). Though the Supreme Court noted that contractual claims are only "generally excluded," courts in this circuit have relied on this dicta, as well as other California cases, to exclude affirmative defenses of comparative fault to breach of contract claims. *See F.D.I.C. v. Mahan*, No. 11-cv-05414-MMM, 2011 WL 13220717, at *5 (C.D. Cal. Nov. 22, 2011) (citing California cases supporting holding that comparative fault affirmative defense does not apply to contract claims); *see also F.D.I.C. v. Varrasso*, No. CIV. 2:11-2628 WBS, 2012 WL 1197712, at *3 (E.D. Cal. Apr. 10, 2012) ("It is well established that comparative fault is not a defense to a breach of contract claim."); *F.D.I.C. v. JSA Appraisal Serv.*, No. 5:10-CV-02077-LHK, 2010 WL 3910173, at *3 (N.D. Cal. Oct. 5, 2010). Though Plaintiff is correct that the court in *Warren*, 2011 WL 5079504, declined to strike this affirmative defense as superfluous at the pleading stage given *Kransco*'s generalized language, the *Warren* court (and the *Kransco* court) gave no indication of the scenarios in which the general rule might give way, such that the affirmative defense would be allowed.

The Ninth Circuit in *Trishan Air, Inc. v. Dassault Falcon Jet Corp.* provided some guidance on this issue, holding that comparative fault applies to a contract-based claim for breach of express warranty where "the contract-based claim" is "essentially an equivalent, alternative method of pleading the same basic theory of liability as the tort claim[]" for strict products liability. *See* 532 F. App'x 784, 789 (9th Cir. 2013). There, the Ninth Circuit cited California case law holding that breach of express warranty claims and strict products liability claims rely on the same theories of liability, such that where one fails so too does the other. *See id.* By contrast, this Court is not aware of (and Defendant does not cite) any case law holding that claims for breach of contract and misrepresentation are simply "alternative method[s] of pleading the same basic theory of liability." And even if the Court could conclude that such a result is possible, the claims in the instant case are not merely two sides of the same coin. Plaintiff's breach of contract claim includes an allegation that Defendant breached the purchase agreement by failing to notify Plaintiff of "any communications regarding the AT&T Rent Stream," which Defendant allegedly

did not do. Compl. ¶ 62. His other three claims do not include this allegation. As such, the claims do not rely on the same basic theory of liability, and thus the affirmative defense of comparative fault does not apply. Finally, the Court holds that comparative fault does not apply to any of Plaintiff's three other claims, rendering the "alternative theory of liability" argument moot.

Finally, as to negligent misrepresentation, the Court agrees with Plaintiff that comparative fault is not a defense to negligent misrepresentation on the facts of this case. The California Supreme Court has recognized that "[n]egligent misrepresentation is a separate and distinct tort [from negligence], a species of the tort of deceit." *Bily*, 3 Cal. 4th at 407; *see also Garcia v. Superior Court*, 50 Cal. 3d 728, 751 n.7 (1990) ("Negligent misrepresentation is a form of deceit without . . . the element of scienter."). The California Supreme Court in *Van Meter* held that a plaintiff is generally not barred from raising a claim for negligent misrepresentation "where his negligence is due in part to his reliance in good faith upon the false representations of a defendant, although the statements were not made with intent to deceive." *Van Meter v. Bent Const. Co.*, 46 Cal. 2d 588, 595 (1956). However, where the plaintiff's reliance is "preposterous or irrational," his own actions may bar the claim. *See, e.g.*, *F.D.I.C. v. Straub*, No. 11-03295 SBA, 2012 WL 1965621, at *3 (N.D. Cal. May 31, 2012) (declining to strike affirmative defense of comparative fault because the court could not hold at the pleading stage that the plaintiff's reliance was not preposterous or irrational). Courts in this district have read *Van Meter* for the proposition that "[i]n cases . . . which arise from an allegation of deceit, the question of whether the plaintiff's behavior is intentional or negligent is subsumed under the element of reliance." *F.D.I.C. v. Luping Lai*, No. 5:11-CV-03313 EJD, 2012 WL 50370, at *2 (N.D. Cal. Jan. 9, 2012).

Moreover, nearly fifty years ago in *Carroll*, the California Court of Appeal held that "the concept [of comparative fault] has no place in the context of ordinary business transactions," as opposed to simple negligence cases, because "[t]he modern law of misrepresentation evolved from the action on the case of deceit in business transactions," wherein "[b]usiness ethics justify reliance upon the accuracy of information imparted in buying and selling, and the risk of falsity is on the one who makes a representation." 98 Cal. App. 3d at 897 (citation omitted); *accord Godfrey*, 128 Cal. App. 3d at 176. In that case, as in *Godfrey*, the court rejected the defendants'

30

1   argument that comparative negligence should apply because the plaintiffs negligently relied on the

2   defendants' misrepresentations. *Id.*

3       Based on these cases, this Court concludes that the affirmative defense of comparative

4   fault is not appropriate here. First, just as with Plaintiff's other claims for deceit, the affirmative

5   defense of comparative fault appears to be merely duplicative of Defendant's argument that

6   Plaintiff fails to satisfy its burden of proving the element of reasonable reliance. Second, as

7   discussed, Defendant's evidence demonstrates, at most, that Plaintiff was negligent in conducting

8   its due diligence; he does not sufficiently prove that Plaintiff's reliance was "preposterous or

9   irrational." As such, even if the affirmative defense were appropriate here under *Van Meter*,

10  Plaintiff has shown that Defendant cannot satisfy *Van Meter*'s requirements.

11      Defendant's attempts to argue to the contrary are unavailing. The Court of Appeal in *Kohn*

12  held that *Carroll*'s rejection of comparative fault in business transaction cases applies only

13  between the plaintiff and the defendant, not between multiple defendant tortfeasors. *Kohn*

14  recognized that *Carroll* applies when the comparative fault is meted between a plaintiff and a

15  defendant, stating "[a]t most, *Carroll* stands for the proposition that as long as the plaintiff is not

16  aware of the true state of facts his negligence in not ascertaining them will not be compared with

17  the negligence of the defendant in making the misrepresentation." 142 Cal. App. 3d at 331. But it

18  declined to apply the rule to "defendants jointly charged with misrepresenting to the plaintiff."

19  *Id.*; *accord Considine Co. v. Shadle, Hunt & Hagar*, 187 Cal. App. 3d 760, 769 (1986). Here,

20  Defendant seeks to use the affirmative defense against a plaintiff, not a joint tortfeasor, so *Carroll*

21  applies.

22      Likewise, Section 552A of the Restatement (Second) of Torts does not dictate a contrary

23  result. First, it relates to contributory negligence, not comparative fault. Second, Defendants do

24  not cite any California cases adopting Section 552A, as opposed to Section 552. And third,

25  subsuming an affirmative defense of comparative fault into a claim that a plaintiff has not proven

26  the element of justifiable reliance appears to comport with "ordinary rules of negligence"

27  contemplated by Section 552A—that is, when a plaintiff is negligent, he may not be able to prove

28  that he reasonably relied on the misrepresentation.

Accordingly, the Court holds that Defendant's affirmative defense of comparative fault cannot be raised as to any of Plaintiff's four causes of action. Thus, the Court GRANTS summary judgment on Defendant's fourteenth affirmative defense.

### 15. Counterclaim: Rescission (Mutual Mistake)

Defendant also asserts a counterclaim for rescission, in which he alleges that "LLB and Loskutoff, through no fault of their own, were both mistaken as to the status of the ATT rent stream during the due diligence period and at the time of execution of the Purchase Agreement." Ans. at 12, ¶ 24. California Civil Code § 1689 allows a party to rescind a contract "[i]f the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake." A mistake of fact is "a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [(1)] An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [(2)] Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." *Id.* § 1577.

Here, the purported fact about which the parties were mistaken is AT&T's termination of the sublease. The Court has already determined that there is no evidence that Plaintiff knew that AT&T had terminated the sublease. Where the mistake is mutual (*i.e.* both parties are mistaken), the defendant must prove "that both parties were mistaken" and that the defendant "would not have agreed to enter into the contract if [he] had known about the mistake." Council of Cal. Advisory Comm. Civil Jury Instruction No. 331. The latter element, put differently, requires "[a] party seeking to rescind a contract [to] show that he has suffered material injury or prejudice although he need not show pecuniary loss." *Guthrie v. Times-Mirror Co.*, 51 Cal. App. 3d 879, 886 (1975)

Plaintiff argues that Defendant's counterclaim must fail for the following reasons[3]: (1) he knew about AT&T's status, and thus he did not make a material mistake; (2) he was not adversely

---

[3] Plaintiff argues that Defendant's counterclaim fails under either a mutual mistake or unilateral mistake theory; hence, its brief argues Defendant fails to satisfy the elements of unilateral mistake, which overlap, in part, with the mutual mistake elements. However, Defendant only claimed mutual mistake in his counterclaim. *See* Answer at 12, ¶ 24.

affected by any such mistake because he gained $925,000 in profits; (3) he bore the risk of the agreement because he made representations and warranties in the agreement about AT&T's status and because he withheld information from Plaintiff relevant to AT&T's status on the tower; and (4) the contract was not unconscionable because Defendant had equal bargaining power and the results of the bargain were not overly harsh or one-sided. Mot. at 19–21. Plaintiff also argues that Defendant waived his right to rescind because he knew in 2014 about AT&T's termination but he waited until 2016 to bring this claim. Mot. at 21–22 (citing *Neet v. Holmes*, 25 Cal. 2d 447, 457–58).

Defendant counters that (1) his knowledge of AT&T's status is a triable issue of fact; (2) he was harmed because he is now subject to expensive litigation; (3) triable issues of fact exist as to whether Defendant knowingly made incorrect misrepresentations and whether he made any representations at all; and (4) the agreement is unconscionable because it has exposed him to this expensive lawsuit. Opp. at 23–25. At the hearing on the motion, Defendant also argued that the transaction injured him because he gave up his rights to the lease and the associated future rent streams. *See* ECF 100 at 25: 18–19. And he argues he has not waived the right to argue rescission because he did not know about AT&T's termination until 2016.

The Court can summarily reject Plaintiff's arguments that Defendant did not make a mistake and that he waived his rescission claim because the Court has already determined that disputed issues of material fact exist as to whether and when Defendant knew about AT&T's termination status.

However, the Court agrees with Plaintiff's argument that Defendant has failed to point to evidence demonstrating that the transaction injured him in any way or that Defendant would not have agreed to enter into the contract had he known about the mistake. The Supreme Court in *Donovan v. RRL Corp.* noted that in order to succeed on a claim of mistake, "[t]he defendant must show that the resulting imbalance in the agreed exchange is so severe that it would be unfair to require the defendant to perform." 26 Cal. 4th 261, 282 (2001), *as modified* (Sept. 12, 2001). "Ordinarily, a defendant can satisfy this requirement by showing that the exchange not only is less desirable for the defendant, but also is more advantageous to the other party." *Id.* Indeed, in

33

*Donovan*, the defendant's mistake would have caused him to sell his car for $12,000 less than the intended price—a 32% reduction in price. *Id.*; *cf. Rios v. Paramo*, No. 13-CV-2455-WQH, 2015 WL 8492500, at *6 (S.D. Cal. Dec. 10, 2015) (holding plaintiff could not show that settlement adversely impacted him because he received $1,000 and could not show that the settlement unfairly benefitted the defendants).

Here, Defendant received $925,000 from Plaintiff because Plaintiff allegedly believed that the lease had two rent income streams. Had the parties known at the time of the transaction that the tower only had one rent income stream, Defendant almost certainly would not have received as much money in the transaction. Thus, Defendant ostensibly *benefited* from the parties' mistake, not suffered from it. It strains credulity to say that Defendant would not have entered into the agreement had he known AT&T had terminated the sublease.

Defendant argues he was injured because he now faces litigation because of the mistake, and because he lost the opportunity for future rent streams from the transaction. As to the latter, Defendant entered into an arms' length transaction with Plaintiff in which he seemingly decided that the future income from the tower with two rent streams was less valuable than the $925,000 he received in return. To say that the tower would somehow have been more valuable to him had he known it had only *one* income stream again is simply not plausible. And Defendant does not otherwise argue that the transaction was unconscionable. As to the litigation expenses, Defendant does not cite a single case in which a party demonstrated injury for the purposes of mistake merely because the mistake subjected him to litigation. Indeed, if litigation expenses alone were sufficient to constitute injury for this claim, any party to a lawsuit raising a mistake claim would satisfy this element, rendering the element a nullity.

Because Defendant has failed to demonstrate that a reasonable jury could conclude the transaction injured him, he fails to satisfy an essential element of his rescission counterclaim. Thus, the Court GRANTS summary judgment on Defendant's counterclaim for rescission.

## V.     ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

      1.      Plaintiff's Motion for Summary Judgment is GRANTED as to Defendant's

counterclaim for rescission and his first, second, third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth affirmative defenses.

2.    Plaintiff's Motion for Summary Judgment is DEFERRED as to Defendant's fourth affirmative defense for failure to mitigate, pending the Court's decision on the evidentiary dispute at the motion in limine stage.

**IT IS SO ORDERED.**

Dated: February 22, 2019

_____
BETH LABSON FREEMAN
United States District Judge